```
 1              UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
 2                    WESTERN DIVISION
                  CASE NO. C-1-03 00607
 3
 4

 5  LYNN D. TUCKER, JR., et al.              PLAINTIFFS

 6          vs.

 7  CITY OF FAIRFIELD, OHIO, et al.          DEFENDANTS

 8

 9

10                            * * * * * * * * *

11  DEPONENT:             LYNN D. TUCKER, JR.

12  DATE:                    JUNE 19, 2006

13                            * * * * * * * * *

14

15

16  ANNA I. CROUCH,
    REPORTER
17                                      ORIGINAL

18

19

20

21       BARLOW REPORTING AND VIDEO SERVICES, LLC
                    Raising the Bar
22              620 Washington Street
              Covington, Kentucky 41011
23                 (859) 261-8440

24

25
```

1  Q. -- and what I'd like for you to do
2 today is explain to me what basis you have -- you
3 personally, or what you've heard -- that the city was
4 selectively enforcing the ordinance essentially that
5 you were charged with violating.
6  A. Uh-huh, okay. I look at it a couple
7 ways. We had asked the city prior if there was any
8 ordinance that would prevent us from displaying the
9 rat and they said no and the police department said no,
10 and by driving up and down Route 4, you could see all
11 types of stuff that were in the right-of-way, you know,
12 for sale signs, and you see balloons, and you see cars
13 -- just all types of stuff -- and you still see it
14 today.
15  So, that told me that, okay, at the time
16 that there was no restrictions for the right-of-way,
17 and when the incident happened with the City of
18 Fairfield and they come out with the police and they
19 had the zoning inspector or whatever title it is show
20 up with the police cars and all of that, and all that
21 notoriety, for a better word, that we got because we
22 were in that right-of-way, and I felt that, you know,
23 with all this other stuff that's been going on and we
24 already checked with them and they had said, no, there
25 was no problem, but now there seems to be a problem.

```
 1              And so then after that, I decided to check
 2   out the ordinance and stuff and whether it really
 3   applied to us, and so we monitored Route 4.  We would
 4   see how many times, you know, the signs would be out
 5   there, and if they stayed out there, and how long they
 6   were out there, and what procedure they would actually
 7   have to go through, you know, for enforcing that
 8   ordinance, and we monitored it.
 9              But the biggest thing that I seen and I
10   heard that really upset me was when we were in court
11   on that injunction and they put Ms. Matala up there,
12   and she talked about how she enforces the zoning, and
13   basically what she was saying was that it might take
14   six months to a year for them to get a sign out of the
15   right-of-way that's been concreted into the ground,
16   you know, a permanent structure.
17              She went through numerous notifications --
18   she did this, she did that, and she did all this other
19   stuff -- but with us she called the police to come
20   out, and there was no violation, you know, no traffic
21   violation.  That was horseshit, and there was no
22   obstruction of the traffic, or nothing.  It was just
23   an ordinance.
24              And then on top of that, once the city
25   found out that the ordinance didn't apply, they went
```

1  She said she drove up and down there once in a while,
2  and that there was one guy, I think she said, that she
3  went back four or five times before she finally got him
4  to move it.
5          Q.   Okay, and did she --
6          A.   And she didn't define any definition
7  between a permanent structure, or a temporary
8  structure, or nothing.
9          Q.   Okay.
10         A.   So, if she don't know, I sure to hell
11 don't know, and to this day I don't know.
12         Q.   Now, I think you answered this in
13 your response, but what would the motivation be on
14 the part of the city to single out the union in terms
15 of the display of the rat?
16         A.   I feel that it was because of
17 Fairfield Ford calling them and telling them that we
18 were hurting its business, and they didn't want us
19 out in front of their business.
20         Q.   Okay.  Now, do you have anything to
21 support that feeling?
22         A.   To support it?
23         Q.   Correct.
24         A.   Yeah, because when that service
25 manager came out there, he said that he had called

1  Q. Okay. At any of those demonstrations,
2 were you run off by local authorities?
3  A. No.
4  Q. Okay. After the incident with the
5 rat on July 31st where you were issued a citation,
6 it's your testimony that you used the rat at the same
7 location approximately eight to ten times; is that
8 true?
9  A. Yes.
10  Q. Isn't that a signal -- isn't that a
11 sign to the public that the union has prevailed; that
12 the union triumphed over the City of Fairfield, and
13 that we are back utilizing the same rat, championing
14 the rights of the worker?
15  A. No.
16  Q. You don't see it that way?
17  A. No. I see it that the only way that
18 the workers were able to protect their rights is that
19 it had to go to the Supreme Court, and in order to
20 go to the Supreme Court to prevail over the City of
21 Fairfield, nobody else is going to be able to take
22 on that challenge, and so it's more of a negative thing
23 than anything else.
24  That you have to spend hundreds of
25 thousands of dollars to get a first amendment action